IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | |
|---|---|
| ANGELINA FRANCESCA WILLIAMS,<br><br>Plaintiff,<br><br>vs.<br><br>LEXISNEXIS RISK SOLUTIONS, INC.,<br><br>Defendant. | Case No.: 2:24-cv-00283<br><br><br>**DEMAND FOR JURY TRIAL** |

## **COMPLAINT**

Angelina Francesca Williams ("Plaintiff" or "Ms. Williams") a living, breathing 53-year-old consumer, brings this action on an individual basis, against LexisNexis Risk Solutions, Inc. ("LexisNexis" or "Defendant") for violating her rights under the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq.

## **INTRODUCTION**

1. The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2. Unfortunately, this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated

1

and/or obtained about them. In fact, Defendant acknowledges this potential for misuse and resulting damage every time it sells its respective services to a consumer.

3. The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4. These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5. Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6. One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

7. The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make

> him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

8. The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9. In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

10. The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11. Plaintiff's claims arise out of Defendant's blatantly inaccurate reporting, wherein Defendant reported to Plaintiff's potential creditors that she is "deceased."

12. Accordingly, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

13. As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## PARTIES

14. Angelina Francesca Williams ("Plaintiff" or "Ms. Williams") is a natural person residing in Virginia Beach, Virginia, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

15. Defendant LexisNexis Risk Solutions, Inc. ("Defendant" or "LexisNexis") is a Delaware corporation doing business throughout the United States, including the Commonwealth of Virginia, in this District and Division. It has a principal place of business located at 1000 Alderman Drive, Alpharetta, Georgia 30005. LexisNexis can be served at its registered agent, C T Corporation System, located at 4701 Cox Rd Ste 285, Glen Allen, VA, 23060 - 6808.

16. LexisNexis is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). LexisNexis is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District and Division.

## FACTS

### Summary of the Fair Credit Reporting Act

19. The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

20. The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

21. Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

22. To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

23. The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

**Defendant's Practices Concerning the Sale of Reports on the "Deceased"**

24. Defendant sells millions of consumer reports (often called "credit reports" or "reports") per day.

25. Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Defendant, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

26. Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like Defendant, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

27. Defendant routinely places a "deceased" notation or marking on reports when it is advised by any of its many data sources that a given consumer is deceased.

28. Defendant does not request or require a death certificate from any of its data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

29. Defendant does not request or require any proof from any data source which advises that a consumer is "deceased," showing that the consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

30. Defendant does not independently verify with any source that a consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

31. In some cases, in order to assure accuracy, Defendant may send letters and/or other communications to consumers when certain information that may be considered suspicious or

unreliable is furnished about said consumers to be placed in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. Defendant does not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when Defendant has received information suggesting the consumer is deceased before adding that information to the consumer's credit file or report.

32.     The Social Security Administration (SSA) maintains the **Death Master File ("DMF")**. The DMF is also known commercially as the Social Security Death Index (SSDI). The SSA's DMF as of 2018 contained information on 111 million deaths that have been reported to the SSA. The DMF is created from internal SSA records of deceased persons possessing social security numbers and whose deaths were reported to the SSA. The DMF includes the following information on each decedent, if the data are available to the SSA: social security number, name, date of birth, and date of death.

33.     Legislation (i.e., the Social Security Act) precludes the sharing of the full DMF with non-benefits paying agencies.

34.     Because of the wide use and demand for death records for a variety of industries, SSA has partnered with the U.S. Department of Commerce's National Technical Information Service (NTIS) to release the **Limited Access Death Master File (LADMF)** electronically on a weekly and monthly basis.

35.     The SSA receives death reports from many sources, including family members, funeral homes, financial institutions, postal authorities, state information, and other federal agencies. The SSA does not have a death record for all persons; therefore, the SSA does not guarantee the veracity of the DMF. The SSA does not guarantee 100% of the data.

36. The SSA estimates that roughly 12,000 living people are added to the DMF annually, potentially due to clerical error. An erroneous listing can lead to not only a cessation of government benefits, but also the freezing of bank accounts, the inability to buy or rent property, and mistaken accusations of identity theft.[1] [2]

37. The Office of the Inspector General called the error rate "very low," but noted that "SSA's erroneous death entries can lead to mistaken benefit terminations and cause severe financial hardship and distress to affected people…when errors like this occur, it can be a long and difficult process to resurrect your financial health.[3]

38. Defendant does not have access to the full DMF from the SSA, but rather is a subscriber to the NTIS LADMF

39. Defendant also obtains death information from third parties other than NTIS.

40. Despite being a subscriber to the NTIS LADMF, Defendant does not cross-reference the information it has received suggesting a consumer is deceased with the LADMF in order to determine whether any given consumer reported as deceased via its source is also on the LADMF before selling a credit report about said consumer, or at any time.

41. Defendant fails to employ reasonable procedures that assure that a consumer is actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

---

[1] *Aviva Dekornfeld (2018-06-20).* "The Plight of the Living Dead". *The Indicator from Planet Money (Podcast).*
[2] Bichell, Rae Ellen (2016-08-10). "Social Security Data Errors Can Turn People into the Living Dead". *National Public Radio.*
[3] "Cases of Mistaken Death Reports Low but Costly | Office of the Inspector General, SSA". *oig.ssa.gov.* 2016-03-24. Archived from the original on 2020-07-16.

42. Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendant does not employ any procedures to assure that a consumer is in fact actually deceased before placing the "deceased" mark in that consumer's file.

43. Even in instances where the purportedly deceased consumer communicates directly with the Defendant, Defendant does not employ any procedures to assure that a consumer is in fact actually deceased before placing the "deceased" mark on that consumer's report.

44. Defendant knows that living consumers are routinely turned down for credit specifically because they are reporting them as "deceased."

45. Defendant has been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because Defendant is inaccurately reporting them as "deceased."

46. Defendant has received and documented many disputes from consumers complaining that Defendant had erroneously marked them as "deceased" on their credit reports.

47. Defendant knows that thousands of consumers are erroneously marked as "deceased" on their credit reports.

48. Nevertheless, Defendant does not employ any procedures to assure that a consumer is actually deceased before adding a "deceased" notation to that consumer's credit reports.

49. Defendant does not employ any procedures to limit or stop the furnishing of reports to third parties for consumers that they have marked as "deceased" under any circumstances.

50. For years after a consumer's actual death, Defendant will continue to sell credit reports about that consumer.

51. Defendant will only remove a deceased consumer's file from its respective credit reporting databases when it is no longer valuable to them—meaning that no one is continuing to purchase reports about that consumer.

52. Defendant charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

53. Defendant profits from the sale of reports on deceased consumers.

54. Defendant knows that truly deceased consumers do not apply for credit.

55. Defendant knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Defendant to be a common and major source of identity theft.

56. Defendant knows that identity theft and credit fraud are serious and widespread problems in our society.

57. Defendant sells reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

58. For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for the Defendant to sell their credit reports, absent a court order.

59. Defendant knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

**Plaintiff Applied for a Capital One Credit Card February 2024**

60. In or around October 2023, Plaintiff had completed the process of discharging her debt through a Chapter 7 Bankruptcy procedure.

61. Following the discharge of Plaintiff's debt, she set out to establish a rebuild her credit by beginning to apply for credit cards.

62. Despite her efforts, Plaintiff was unable to see her credit score rise and assumed the cause had to be low credit limits and a poor credit mix.

63. Plaintiff suffered a stroke in or around January 2024, and therefore took a step back from building up her credit while trying to recover her health.

64. As Plaintiff recovered, she reviewed varying credit card promotions and wanted to find for the right card for her.

65. It was important to Plaintiff to apply for the right credit opportunities in order to be able to build her credit back up.

66. Accordingly, in or about February 6, 2024, Plaintiff completed and submitted an online pre-approval application with Capital One for a credit card.

**Capital One Denies Plaintiff's Credit Card Application February 2024**

67. Capital One ordered a consumer report about Plaintiff from Defendant in or around early February 2024.

68. Defendant published information about Plaintiff to Capital One in response to that credit application on or about early February 2024.

69. Upon receipt and review of Defendant's report about Plaintiff, Capital One denied Plaintiff's credit card application. Specifically, Capital One denied Plaintiff's credit card application because Defendant reported Plaintiff deceased.

70. Upon information and belief, Capital One denied Plaintiff's credit card application based upon the contents of a consumer report Defendant sold about Plaintiff.

71. Plaintiff was disappointed at the Capital One credit card denial. Certainly, Plaintiff was not deceased. Plaintiff found that information to be very distressing and confusing, even shocking. Plaintiff assumed it was just some sort of fluke and endeavored to continue to seek opportunities for credit.

### Plaintiff Applied Again for a Capital One Credit Card March 2024

72. Plaintiff applied to a variety of other creditors for credit cards after the Capital One denial in February 2024, citing her Chapter 7 bankruptcy as the reason.

73. Nonetheless, Plaintiff was determined to build her credit and continued looking for opportunities.

74. On or about March 12, 2024, Plaintiff completed and submitted an application with Capital One for a credit card.

### Capital One Denies Plaintiff's Credit Card Application March 2024

75. Upon information and belief, Capital One ordered a consumer report about Plaintiff from Defendant on or about March 12, 2024.

76. Upon information and belief, Defendant published information about Plaintiff to Capital One in response to that credit application on or about March 12, 2024.

77. Upon receipt and review of Defendant's report about Plaintiff, Capital One denied Plaintiff's credit card application.

78. On or about March 12, 2024 Plaintiff received an adverse action notice from Capital One denying her credit card application. Specifically, Capital One denied Plaintiff's credit card application because Defendant reported that Plaintiff was deceased.

12

79. Upon information and belief, Capital One denied Plaintiff's credit card application based upon the contents of a consumer report Defendant sold about Plaintiff.

80. After receiving another denial that reported Plaintiff was deceased, Plaintiff, who received regular disability benefits from the Social Security Administration ("SSA") decided to access her online SSA records to ensure she was not being reported as deceased.

81. A thorough review of Plaintiff's online profile on the SSA website and her benefits documents did not reveal any indication that she was being reported as deceased by the SSA.

82. Furthermore, Plaintiff continued to receive her disability benefits from the SSA without issue, further indicating that they had not reported her as deceased.

83. Plaintiff was embarrassed to learn that Defendant had reported that Plaintiff was deceased. Certainly, Plaintiff was not deceased. Plaintiff was very distressed at the continued furthering of information suggesting she was deceased. Plaintiff was frustrated at the credit denial because she very much needed to rebuild her credit. Plaintiff felt that the recipients of that information no doubt questioned her motives and integrity and worst yet possibly suspected her of identity theft as they could clearly discern that s*he* was not deceased.

**Plaintiff Obtains Her Consumer Report and Confirms that Defendant Was Reporting Her as Deceased**

84. In or around March 8, 2024, Plaintiff viewed copies of her consumer reports from the three major consumer reporting agencies ("CRA's") Equifax, Experian, and Trans Union.

85. Plaintiff's Equifax consumer report had no mention of any deceased notation.

86. Plaintiff's Trans Union consumer report had no mention of any deceased notation.

87. Plaintiff was unable to access her Experian consumer report due to technical difficulties, but had been denied credit in the past due to Experian reporting her Chapter 7 bankruptcy to creditors.

88. In or about March 9, 2024, Plaintiff viewed her LexisNexis consumer report.

89. Upon information and belief, Defendant is the only credit reporting agency that could have been reporting Plaintiff was deceased to her potential creditors.

90. Plaintiff reasonably believes that Defendant sold Capital One an identity verification product that is not visible on her consumer disclosure.

91. Defendant had every reason to know that Plaintiff was not deceased, including the many credit applications submitted by Plaintiff, the many credit accounts opened, the many payments made since then, and Plaintiff's regular disability benefits from the SSA.

92. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the consumer information it published and maintained concerning Plaintiff.

93. As a result of the deceased notation, Defendant made it practically impossible for Plaintiff to continue to obtain credit.

94. At all times pertinent hereto, Defendant was acting by and through its agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

95. At all times pertinent hereto, the conduct of Defendant, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

96. Defendant is aware of the shortcomings of its procedures and intentionally chooses not to comply with the FCRA to lower its costs. Accordingly, the Defendant's violations of the FCRA are willful.

97. As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

98. Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

99. The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure *maximum possible accuracy* of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

100. On numerous occasions, Defendant prepared patently false consumer reports concerning Plaintiff.

101. Despite actual and implied knowledge that Plaintiff is not dead, Defendant readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

102. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer reports it published and maintained concerning Plaintiff.

103. As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to

her credit rating; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

104. Defendant's conduct, actions, and inactions was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

105. Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i. Determining that Defendant negligently and/or willfully violated the FCRA;

ii. Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii. Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv. Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Respectfully Submitted,

Angelina Francesca Williams

_____/s/_____
Susan Mary Rotkis, VSB 40693
CONSUMER ATTORNEYS
2290 East Speedway Blvd.
Tucson, AZ 85719
Direct: 602-807-1504
Facsimile: 718-715-1750
E-mail: srotkis@consumerattorneys.com
*Attorney for Plaintiff*
*Angelina Francesca Williams*